**LANDGRAF v. UNITED STATES et al.**
**No. 141 of 1946.**

District Court, E. D. Pennsylvania.
Aug. 4, 1947.
As Amended Oct. 21, 1947.

Freedman, Landy & Lorry, by Wilfred R. Lorry and Charles Lakatos, all of Philadelphia, Pa., for libelant.

Gerald A. Gleeson, U. S. Atty., and Krusen, Evans & Shaw, by Thomas E. Byrne, Jr., and Robert Cox, all of Philadelphia, Pa., for United States and War Shipping Administration.

Rawle & Henderson, by Thomas F. Mount, all of Philadelphia, Pa., for impleaded respondent.

GANEY, District Judge.

This is a suit brought by a longshoreman pursuant to the Suits in Admiralty Act[1] to recover damages for injuries sustained by him while he was employed on a merchant vessel owned by the United States

From the evidence presented to it, the court makes the following special

### Findings of Facts:

1. The libellant is John W. Landgraf, a resident of Philadelphia, Pennsylvania, the respondent is the United States of America, and the impleaded respondent is the Independent Pier Company, an independent stevedoring concern.

2. On December 7, 1944, the Steamship Harry Lane (PH-379), a merchant vessel owned by the respondent through the War Shipping Administration, was moored at the Hog Island Ammunition Pier in the Delaware River, at Philadelphia, Pennsyl-

vania, within the territorial limits of the Eastern District of Pennsylvania.

3. Because of the dangers attending the loading of vessels with ammunition, the United States Army and the United States Coast Guard maintained general supervision and control of the Hog Island Ammunition Pier and the loading of vessels adjacent thereto.

4. On December 7, 1944, libellant then thirty-four years of age, was working as a carpenter on the S. S. Harry Lane as an employee of the Independent Pier Company, which was engaged to load the vessel with ammunition pursuant to the provisions of a contract entered into between the respondent and the Company on July 1, 1944, and effective until June 30, 1945. Article XXIII(a) of the contract provided:

"While performing the work, the stevedores shall * * * be responsible for any and all loss, damage or injury * * * to persons, cargo, vessels, or other property or thing, arising through the negligence or fault of the stevedore, its employees, gear or equipment; provided, however, * * * that the stevedore shall not be responsible to the Government for any such loss, damage or injury resulting from the negligence or wrongful acts of the Government or from acts of the stevedore or its employees performed in compliance with the specific directions of the Contracting Officer or from the fault of ships or other gear supplied by the Government."

5. Libellant, the foreman of a group of carpenters, was charged with storing and chocking boxes of ammunition as they were lowered into the hold of the vessel by the stevedores, who were also the employees of the Independent Pier Company. The libellant had no supervision over or any connection with the operation, maintenance and inspection of the vessel's loading gear and tackle; nor was he responsible for, or in any way connected with, the removal or inspection of the vessel's hatch beams and there locks.

6. The No. 2 hatch of the S. S. Harry Lane was approximately thirty-one and one half feet long and eighteen feet wide, and

[1] Act of March 9, 1920, c. 95, Secs. 1–12, 41 Stat. 525–528, as amended, 46 U.S.C.A. §§ 741–752.

was surrounded by a thirty inch high coaming.

7. The cover of the No. 2 hatch consisted of seven sections of boards supported by six removable steel hatch beams, eighteen feet long which ran athwart the hatch opening at intervals of four and one-half feet. Each beam fitted into vertical grooves and rested upon horizontal supports which were fastened to the inside of the hatch coaming. Each beam, except as found in Finding of Fact No. 13, was equipped with beam locks at the ends of the beam. These locks were intended to prevent the upward movement of the beam.

8. A beam lock consisted of an oblong piece of metal approximately four inches long, two inches wide and three quarters of an inch thick, which could be rotated, like a cam, on a bolt that pierced the reinforced end of the hatch beam. The long end of the oblong piece of metal fitted into a ninety degree notch in a portion of the extended groove similar to a pawl in a stationary ratchet wheel. When the oblong piece of metal was engaged, the beam could not be removed from the groove. In order to disengage the lock, the oblong piece of metal would have to be rotated out of the ninety degree notch.

9. When the hatch beams were not removed from the hatch, the respondent required them to be locked securely in their coaming grooves in order to eliminate the possibility of their being dislodged and falling into the hold of the vessel.

10. At about 1:00 o'clock on December 7, 1944, the stevedores, in preparing for the loading activities on the S. S. Harry Lane, removed three sections of boards and the No. 1 and No. 2 hatch beams (those nearest the bow) of the No. 2 hatch, thereby leaving an opening of approximately eighteen feet athwartship and thirteen and one half feet long.

11. The stevedores, by removing only the No. 1 and No. 2 hatch beams, left the smallest opening possible which would permit the freely passing through of a circular steel cargo tray approximately six feet in diameter. This procedure, in addition to saving time at a period when time was of the essence, was in accord with the usual practice in opening hatches during the war, and pursuant to instructions issued, for safety and security reasons, by the War Department.

12. At about 1:15 o'clock, while the libellant was working in the 'tween deck section of the No. 2 hold, the stevedores were in the process of removing a manila rope net sling which was in the 'tween deck section approximately eight feet beneath the No. 3 and No. 4 hatch beams. The top of the boom (capacity of five tons), to which was rigged the midship or up and down fall (three quarters of an inch in diameter), was over the center of the hatch opening. The starboard winch which controlled the up and down fall, had a lifting capacity of fifty tons. The hook which was attached at the end of the fall was lowered into the hold, pulled aft under the No. 3 and No. 4 hatch beams and hooked onto the manila rope net sling, which had not been completely emptied of its chocks. As it was slowly raised to remove the net from the hold, the fall rubbed against the edge of the No. 3 hatch beam until the protruding eye of the screw of the shakle (shaped in the form of an inverted letter "U") caught under the edge of the No. 3 hatch beam and lifted the beam from its grooves in the coaming. The beams and the boards which it supported fell into the hold and struck the libellant on the head and back, seriously injuring him and rendering him unconscious.

13. The No. 3 hatch beam was unseaworthy, because at the time it was dislodged from its grooves in the coaming, a beam lock at one end of it was missing. The libellant was not aware of this fact nor would he, by using due care under the circumstances, be expected to have observed this defect.

14. However, reasonable inspection of the hatch beam by the respondent would have disclosed that the beam lock was missing.

15. The manner in which the stevedores attempted to remove the rope net sling from the 'tween deck section of the vessel was negligent.

16. The negligence of the stevedores was not a superseding cause of, but, to-

gether with the unseaworthiness of the beam, contributed to the falling of the hatch beam and boards into the hold of the vessel.

17. Libellant was removed to St. Agnes' Hospital where he was found to have sustained a compound compression fracture of the right upper anterior and middle parietal region of his skull, lacerations of the brain, brain hemorrhage, and fractures of the first to fourth transverse processes of the lumbar vertebrae on his right side.

18. Libellant was hospitalized from December 7, 1944, to January 17, 1945, during which time he received surgical treatment, which included removal of a large piece of his skull, removal of numerous pieces of bone fragments from his brain, and a removal of a blood clot in the vicinity of his right lumbar muscles.

19. For several months after January 17, 1945, libellant had received medical treatment at the private offices of several physicians.

20. At the time of the trial, the libellant had an extensive lesion of the right parietal lobe of his brain, a depressed scar on his skull approximately three inches long and three quarters of an inch wide and deep where the skull had been fractured. As a result of the injury to his brain, the libellant suffers from headaches, dizziness, somnolence, and astereognosis (loss of ability to recognize the shapes of objects by handling them) of the left hand. He also experiences sensory Jacksonian epileptic fits due to the irritation to his brain by the scar tissue and other changes within his brain.

21. The injuries sustained by the libellant have permanently incapacitated him from performing in the future the work of a carpenter in the same manner as he did prior to his sustaining the injuries, and from performing work requiring skilled action of both hands. However, he will be able to become gainfully employed, but his earning power has and will be decreased approximately forty percent.

22. The damages sustained by the libellant are as follows:

| | | |
|---|---|---|
| (a) Loss of earnings to date of trial | $ 6,333.02 |
| (b) Present value of loss of future earnings reduced by capitalization at three percent | 34,920.00 |
| (c) Pain and suffering, past, present, and future | 12,000.00 |
| Total | $53,253.02 |

### Conclusions of Law.

1. This court has jurisdiction of the parties and the subject matter of this suit.

2. The libellant was injured as the result of maritime wrongs while he was performing work in aid of navigation on a merchant vessel which was on navigable waters of the United States.

3. The proximate or legal cause of the injuries sustained by the libellant was (a) the breach of respondent's nondelegable duty to provide a seaworthy vessel for him to work upon, and (b) the breach of the impleaded respondent's duty not to load the vessel in a negligent manner.

4. In sustaining his injuries, the libellant was without fault.

5. The libellant is entitled to recover damages totaling Fifty Three Thousand, Two Hundred Fifty-three and 02/100 Dollars ($53,253.02), plus cost of this suit from the respondent.

### Discussion

The grounds upon which the libellant claims as being the proximate cause of his injuries are two in number. The first is the unseaworthiness of the S. S. Harry Lane with respect to her hatch beam, and the second is the negligence of the respondent. It is now elementary that the proving of either one of these grounds will entitle the libellant to recover damages. Seas Shipping Co., Inc., v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

Before going into the matter of liability, we must dispose of the question of the admissibility of certain documents subpoenaed from the respondent's files and offered into evidence by the libellant under

the act[2] which makes admissible, when they are properly offered in evidence, writings and records made in the regular course of business. It is apparent that if the accident report[3] signed by Lieut. Wm. H. Jenkins, dated December 7, 1944, is admitted into evidence, it would prove or tend to prove that one of the beam locks on the No. 3 hatch beam was missing. It is also apparent that if the copies of the other statements[4] were likewise admitted into evidence, they would prove or tend to prove that there was a duty placed upon the Loading Officers at the Hog Island Pier to inspect the hatch beams. Accordingly, while this court is persuaded that they are admissible, there was sufficient evidence, independent of them from which it may find that the S. S. Harry Lane was unseaworthy with respect to the No. 3 hatch beam.

At the close of libellant's case, the proctor for the respondent offered no evidence and moved to dismiss the libel for the alleged reasons that (1) the libellant had failed to prove that prior to the falling of the hatch beam, the beam lock at one end of it was missing, and (2) even if he proved unseaworthiness, the evidence showed that Independent Pier Company's negligence was the proximate or superseding cause of the falling of the hatch beam and boards into the hold of the vessel.

In support of its first reason, the proctor for the respondent, citing Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339, 340, 53 S.Ct. 391, 77 L.Ed. 819 and Grand Trunk Western R. Co. v. Holstein, 6 Cir., 67 F.2d 780, 782, contends that the state of proof is such that any one of the three following inferences can be drawn from it, any one of which is just as logical as the other: (1) the beam lock was broken prior to the accident; (2) the beam lock was engaged, but it broke at the time the hatch beam was dislodged; and (3) the beam lock was disengaged and broke when the beam fell into the hold of the vessel.

It is true that the libellant did not produce a witness who could say that he saw that the beam lock was missing prior to the accident. But on the other hand, he did produce witnesses who testified that within a short time after the accident, they observed that one end of the No. 3 hatch beam was minus a lock and that there was no evidence to indicate that a recent break had taken place—that is, the bolt on which the rectangular portion of the lock was supposed to be attached was completely rusted. As a result of this evidence, the second and third inferences of fact stated above must be taken in connection with the further inference that the bolt on which the rectangular piece of metal rotated was so thoroughly corroded by rust that it could not withstand any appreciable strain. So whether the lock was engaged and broke at the time of the dislodgment of the beam or it was not engaged and broke when the beam fell into the hold will not help the respondent's position in this case. For if it could be found that the lock was not missing prior to the accident, the court must conclude that its presence there was equivalent to no lock at all.

The other reason advanced that the respondent is relieved of liability because the negligence of Independent Pier Company was the proximate or superseding cause of the accident does not stand critical analysis. This same reason for non-liability was asserted in Porello v. United States, 2 Cir., 153 F.2d 605, affirmed in American Stevedores, Inc. v. Porello 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. —— a case involving a factual situation similar to the one in the instant case. In that case the court held that the absence of a beam lock and the negligence of a stevedore (who knew of the absent lock), in ordering a load, which had just recently been lowered into the hold, to be raised, operated concurrently in causing a hatch beam to fall into the hold. We must concede that in the case before us, the stevedores were ignorant of the fact that the hatch beam was minus a lock. However, this ignorance did not relieve them under the circumstances from using due care in loading the vessel. In our opinion, the attempt to remove and empty, at the same time, a net sling which was under the covered portion of the

---

[2] Act of June 20, 1936, c. 640, 49 Stat. 1561, 28 U.S.C.A. § 695.

[3] Libellant's exhibit No. 8.

[4] Libellant's exhibits Nos. 5, 6, 7 and 9.

hatch was improper and constituted negligence on the part of the stevedores.

Whether Article XXIII(a) of the contract entered into between the respondent and the impleaded respondent-stevedore will permit the former to be indemnified in whole, in part or not at all from the latter can not be determined in this suit as the record now stands. In American Stevedores v. Porello, supra, at page 853 of 67 S.Ct., the Supreme Court made an observation applicable here: "On this record we cannot answer the contention of either party. As it stands the clause is ambiguous. Evidence might well have been taken as to the intention of the parties, but was not. It may be that the parties only meant [the stevedore] to indemnify the United States should the Government be held liable for damages solely caused by [the stevedore's] negligence. It may be that the intention was that [the stevedore] should fully reimburse the United States for all damages caused in any part by [the stevedore's] negligence. Finally, the parties may have intended that [the stevedore], in case of joint negligence of the parties, should be responsible for that proportion of the damage which its fault bore to the total fault." Therefore the parties to the contract must be given an opportunity to submit evidence as to their intentions with respect to Article XXIII(a) so that the court may be able to interpret it and determine what amount, if any, one of them may recover over from the other.

The libellant may present a decree in accordance with this Opinion.