**FEATHERSMITH v. UNITED STATES**
(Thomas, third-party defendant).
Civ. A. No. 11619.

United States District Court
E. D. Pennsylvania.

April 10, 1952.

Reuben Singer, Philadelphia, Pa., for plaintiff.

G. A. Gleeson, U. S. Atty., for defendant.

GRIM, District Judge.

Plaintiff has sued the United States [1] under the Federal Tort Claims Act, 28 U.S.C., §§ 1346, 2671 et seq., alleging personal injuries caused by the negligence of a Government employee acting within the scope of his employment and engaged in the business of defendant. On the basis of the

---

[1]. The United States was granted leave to join Horace Lee Thomas as third-party defendant, but service of process could not be made and was not made upon Mr. Thomas, because he was out of this jurisdiction on active duty with the U. S. Army. Mr. Thomas, therefore, is not a party in this case.

pleadings and the testimony in the case, I make the following

### Findings of Fact

A. *As To Liability:*

1. The plaintiff is Edna Feathersmith, a resident of Philadelphia, Pennsylvania, who, while a passenger in an automobile owned and operated by Horace Lee Thomas, suffered injuries as a result of a collision between defendant's mail truck and the Thomas car at the intersection of 15th and Market Streets in Philadelphia at about 9:45 P.M. on October 28, 1950.

2. The defendant is the United States of America, whose employee, Thomas E. Cooper, at the time of the accident, was driving a three-ton mail truck on defendant's business and within the scope of his employment.

3. Just before the collision, the Thomas automobile, which was heading west, had stopped for a red traffic light in the north lane on Market Street east of 15th Street. Immediately in front of the Thomas automobile and between it and 15th Street a taxi cab had also stopped for the red light. Immediately to the rear of the Thomas automobile defendant's mail truck had stopped for the same red light. On the westbound trolley tracks to the left of the Thomas car one automobile and immediately behind it a trolley car had also stopped for the red light.

4. When the traffic light changed to green, the taxi cab in front of the Thomas car started to move straight ahead, crossed 15th Street, and came to a stop behind some double-parked cabs in the north lane west of 15th Street. Thomas, following the taxi cab at a speed of about seven miles per hour, started across 15th Street, continued across 15th Street, and came to a gradual stop about eight feet behind the cab. At that point the front of the Thomas car was three feet west of the west curb line of 15th Street and the rear end of the car was in the westerly half of 15th Street.

5. Immediately after the Thomas car had stopped, the mail truck drove into it and struck it in the rear with an impact that knocked the Thomas car about six feet toward the curb.

6. As a result of the impact, plaintiff, who was seated beside the driver of the Thomas car, received a whip lash injury to her neck and was thrown forward so that her head hit and shattered the right side of the windshield.

7. Defendant's employee was negligent in the operation of the United States mail truck immediately preceding the accident, in that he drove the truck at an excessive speed under the circumstances and drove his truck too close to the rear of the Thomas car, considering his rate of speed, and in that he failed to have his truck under proper control.

8. The collision and the injuries sustained by plaintiff as a result thereof were proximately caused by the negligent operation of the mail truck by defendant's employee engaged in the business of defendant and within the scope of his employment.

9. The accident was not caused or contributed to by any negligence on the part of the plaintiff.

B. *As To Damages:*

10. Immediately after the collision, plaintiff was dizzy and nauseous and she couldn't stand up. Her forehead was cut and her nose bruised and bleeding. She was taken to Hahnemann Hospital where she began to get a sharp and stabbing pain in the neck and extending to the right shoulder and arm. She was placed on a stretcher, x-rays were taken of the neck, she was placed in a Thomas collar to immobilize her neck, and she was sent home to await a bed, since no beds were then available at the hospital. That same night, when she arrived home, she had severe throbbing headaches and throbbing pain in the back, back of the neck, right shoulder, and right arm. The pain in those areas has persisted from the date of the accident to the time of the trial, a period of one year. She couldn't sleep that night after returning from the hospital.

11. The next morning she returned to the hospital, where the Thomas collar was removed. She was then examined and the collar was replaced. Since no beds were yet available, she returned home. Unable to sleep because of severe pain, she called her personal physician, Dr. Rose, who gave

her medication which failed to relieve the pain. The following day she returned to the hospital, where no beds were yet available. She was examined there by Dr. Geckler, an orthopedist, who told her to return home, stay in bed and not move around until called by the hospital. Her condition had not improved.

12. The next day plaintiff engaged a practical nurse to take care of her and her nine year old daughter and seven year old son at a salary of $15 a week. The nurse worked for plaintiff for thirty-six weeks.

13. Plaintiff was given a bed at the hospital on November 1, 1950. There her neck was put in traction by means of placing a sort of harness around her head and chin connected with weights over the end of the bed. She was kept in that position for six days, during which time she had severe headaches and a continual knife-like pain in the spine at the neck and continuing down the right shoulder and arm. After the six days in traction, she was placed in a large plaster of paris body cast which extended from the top of her head, down along the eyebrows, around the face and up on the chin, down the neck, over the shoulders, and down the trunk of the body to the hips. Her head was extended backward and immobilized in that position, so that she was continually looking at the ceiling. Her pain was slightly relieved by the large cast. She remained in the hospital for nine days and was then sent home in the large cast by a cabulance.

14. A short time later plaintiff was given a nerve block for the purpose of deadening the pain in her neck, but instead of affording relief the nerve block increased the pain to such an extent that she called Dr. Rose to her home late that night. Dr. Rose's medication failed to relieve her pain.

15. On December 12, 1950, the large cast was removed and additional x-rays were taken at the hospital. On December 16, 1950, she was placed in a smaller cast, which held her head immobile in the same position as had the large cast. She wore this smaller cast until February 20, 1951, but felt no improvement. On the day the cast was removed a myelogram was taken by Dr. Olsen. She was kept in the hospital for six days where she continued to suffer a great deal of pain in the neck and shoulder area and had no feeling in the right hand. After being given many tests she was again put in traction, but this did not help. She was then sent home, but soon returned to the hospital to see Dr. Geckler, because of the intense pain. After more tests and treatments she was again put back in a small cast, which remained on from May 11 or 12, 1951 to August 17, 1951. During all this time the only relief she obtained from pain was in lying down.

16. From the time of the accident to the time of the trial plaintiff's weight had dropped from 119 pounds to 98 pounds. At the time of the trial she was still suffering from intermittent headaches often lasting three or four days. She had pain in the top of her head and in the entire neck. The pain in her neck was aggravated by attempts to turn her head and neck sideways or to bend her head and neck forward and backward. She held her neck rigidly and found it extremely painful to move it. The pain extended down the neck to the right shoulder and down the right arm, particularly on the outer surface. She had atrophy or shrinkage of the muscles in the right arm and swelling of the palm of the right hand. She had no feeling or sensation in her right arm and right leg and scattered anesthesia or absence of sensation in the right side of the body. At the time of the trial plaintiff was still under the care of Dr. Rose and was waiting for a bed to re-enter the Hahnemann Hospital under the care of Dr. Geckler.

17. Plaintiff has suffered a severe neck injury which consists of a herniated disc in the cervical vertebrae [2] together with torn ligaments in the neck. The pain in her neck, right shoulder, right arm, and right leg will remain with her for the rest of her life, as will her intermittent headaches and the absence of sensation or feeling on the right side of her body. Also permanent are the atrophy of the muscles in her right arm and the limitation of motion of the head and neck, because of the ex-

2. Testimony of Dr. Rose, N.T. 66, 68, 74, and Dr. Chance, N.T. 147.

treme pain incurred in any movement of the neck. Removal by surgery of the offending disc and fusion of the cervical vertebrae involved are possible methods of alleviating plaintiff's painful condition, and the chances of a successful operation are good. However, great pain and discomfort are involved in this type of surgery and there is a possibility of a fatal result. In view of this, I have not reduced the amount of the award, because of the possibility of this operation. See Potts v. Guthrie, 282 Pa. 200, 127 A. 605. Perhaps by use of this operation plaintiff's disability at some future time will change from total to partial, but at best plaintiff will always have a stiff neck and a high rate of disability. Plaintiff's disability is permanent and total. Her various pains, headaches, necessarily rigid neck, lack of feeling of touch in the right hand, and inability to stand or sit for very long without great pain will prevent her from working for a living and doing her own housework.

18. Prior to the accident plaintiff had been employed for three years as a floorlady at Hart and Foster Textiles where she earned take-home pay of $46.80 per week. Her duties included lifting bolts of cloth weighing up to forty pounds in order to examine and inspect them. Her loss of wages from October 28, 1950, the date of the accident, to October 24, 1951, the date of the trial, amounted to $2,433.60.

19. As a result of the injuries sustained in the accident, plaintiff up to the time of the trial had incurred the following hospital, medical and nursing expenses, which total $1,110:

| | |
|---|---|
| Hospital bill | $218.00 |
| Doctors' bills | 352.00 |
| Nurse's bill | 540.00 |

20. As a result of the injuries sustained in the accident, plaintiff's future loss of earnings, reduced to their present value, based on a reasonable life expectancy of 32 years and taking into account her diminution of earning capacity as she grows older, will amount to $40,000.

21. Plaintiff's future hospital and medical expenses resulting from the injuries sustained in the accident will amount to $2,500.

22. Plaintiff's past and future pain, suffering, and inconvenience resulting from the injuries sustained in the accident I assess in the amount of $10,000.

### Conclusions of Law

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The accident and resultant injuries to plaintiff were proximately caused by the negligence of defendant United States of America's employee in his operation of the United States mail truck within the scope of his employment.

3. The accident was not caused or contributed to by any negligence on the part of plaintiff.

4. Plaintiff is entitled to a judgment against defendant in the amount of $56,043.60, with costs.