James LEBECK

v.

WILLIAM A. JARVIS, Inc.

and

Philadelphia Electric Company.

James LEBECK

v.

CRANE OPERATING COMPANY, Inc., Defendant and Cross-Defendant

and

Levitt and Sons, Inc., Defendant, Third-Party Plaintiff and Cross-Claimant (William A. Jarvis, Inc., Third-Party Defendants).

Civ. A. Nos. 16087, 16395.

United States District Court
E. D. Pennsylvania.

Oct. 5, 1956.

B. Nathaniel Richter (of Richter, Lord & Levy), Philadelphia, Pa., for James Lebeck.

Thomas E. Comber, Jr. (of Pepper, Bodine, Frick, Scheetz & Hamilton), Philadelphia, Pa., for Wm. A. Jarvis, Inc.

Michael A. Foley, Philadelphia, Pa., for Philadelphia Electric Co.

Thomas E. Comber, Jr., Philadelphia, Pa., for Crane Operating Co.

Joseph J. Murphy and Mark D. Alspach (of Krusen, Evans & Shaw), Philadelphia, Pa., for Levitt & Sons, Inc.

VAN DUSEN, District Judge.

These cases arise out of a tragic accident which took place on May 1, 1953, during the construction of a drainage ditch across the land of the Philadelphia Electric Company by William A. Jarvis, Inc., as general contractor for Levitt and Sons, Inc., which had been granted an easement over this land to construct such a ditch. Plaintiff's injuries resulted from a high voltage of electric cur-

rent[1] passing through his body, as more fully discussed below under the heading "Amount of Verdict." After judgment in the amount of $350,000 was entered in favor of the plaintiff and against William A. Jarvis, Inc., Crane Operating Company, Inc., and Levitt and Sons, Inc., on the jury's answers to special questions[2] in accordance with F.R.Civ. P. 49(a), 28 U.S.C., several post-trial motions were filed which are now before the court for disposition.

The evidence, in the light most favorable to the plaintiff, establishes this factual situation:

1. 19,000 volts of electricity were passing through each of 3 overhead wires (N.T. 80, 95). The electricity apparently was conducted from the wires to plaintiff's body by a crane being used to place concrete pipe in the drainage ditch, where plaintiff was working (see P–10, N.T. 120–1).

2. The following special questions were answered by the jury:

"1 (a) Was William A. Jarvis, Inc. negligent and was such negligence a substantial factor in causing the injuries of plaintiff, James Lebeck?

| X | |
| --- | --- |
| Yes | No |

If your answer is 'yes,' indicate by an 'x' (to be inserted where applicable) if this negligence was active and primary X or passive and secondary ———.

"1 (b) Was Crane Operating Company, Inc. negligent and was such negligence a substantial factor in causing the injuries of plaintiff?

| X | |
| --- | --- |
| Yes | No |

If your answer is 'yes,' indicate by an 'x' (to be inserted where applicable) if this negligence was active and primary X or passive and secondary ———.

"1 (c) Was Levitt and Sons, Inc. negligent and was such negligence a substantial factor in causing the injuries of plaintiff?

| X | |
| --- | --- |
| Yes | No |

If your answer is 'yes,' indicate by an 'x' (to be inserted where applicable) if this negligence was active and primary X or passive and secondary ———.

"1 (d) Was the Philadelphia Electric Company negligent and was such neg-

---

A. Under date of September 12, 1952, counsel for Levitt and Sons, Inc., wrote a letter to the Assistant General Counsel of Philadelphia Electric Company, proposing a settlement of "various problems outstanding" between the two companies (P–1). Paragraph 5 of this letter contained the following language:

"Electric will permit Levitt to construct drainage ditches not in excess of 70 feet wide through its Emilie Substation property, * *.

"The construction of the drainage ditches on the Emilie Substation

ligence a substantial factor in causing the injuries of plaintiff?

| | X |
| --- | --- |
| Yes | No |

If your answer is 'yes,' indicate by an 'x' (to be inserted where applicable) if this negligence was active and primary ——— or passive and secondary ———.

If your answer to any of the questions listed above is 'yes,' answer question 2. If your answer to all the questions listed above is 'no,' do not answer question 2.

"2. Was the plaintiff, James Lebeck, negligent and did such negligence contribute to his injuries?

| | X |
| --- | --- |
| Yes | No |

If your answer to this question is 'yes,' do not answer the questions listed below. If your answer to this question is 'no,' answer the questions listed below.

"3. What were the damages suffered by plaintiff?

$ 350,000.00

"4. Was Levittown Supply Corporation negligent and was such negligence a substantial factor in causing the injuries of plaintiff?

| | X |
| --- | --- |
| Yes | No |

If your answer is 'yes,' indicate by an 'x' (to be inserted where applicable) if this negligence was active and primary ——— or passive and secondary ———.

"5. Was the plaintiff at the time of this accident working under and subject to the control of the superintendent and foreman of William A. Jarvis, Inc.?

| | X |
| --- | --- |
| Yes | No"

property of Electric shall be made in the manner and at the locations indicated on Drawing No. 731 of Levitt and Sons, Incorporated, dated August, 1952, and entitled 'Preliminary Drainage Plan for Main Ditch No. 3 and Branch Ditch No. 3–C.' " [3]

By letter of the same date (P–26), the Assistant General Counsel of Philadelphia Electric Company accepted the proposals in the above-mentioned letter from counsel for Levitt and Sons, Inc., and stated:

"I am also authorized to inform you that your construction forces may commence work on the drainage ditches on our property at any time on and after September 15, 1952, provided, however, that notice of the time and place of the commencement of work is given in advance to Mr. William F. Roth, Division Superintendent, whose office is located at 1938 Wharton Road, Jenkintown, Pennsylvania." [4]

Mr. Ludlow, General Superintendent of construction of Levitt and Sons, Inc., was notified by the Legal or Engineering Department of his company in connection with this 3–C project: "We completed our negotiations; notify them when you go in." (N.T. 1108.)

Levitt and Sons, Inc., entered into a contract with William A. Jarvis, Inc.,

dated March 3, 1953 (D–40), to which there was attached an addendum dated April 8, 1953, providing for construction by William A. Jarvis, Inc., of "Main Drainage Ditch 3–C * * * to include three (3) culverts and three (3) check dams." Mr. Roth testified that he never received any notice that work had begun on this drainage ditch, which was constructed in the vicinity of the Emilie Substation of the Philadelphia Electric Company. If he had received such notice, Mr. Roth testified that the wires would have been de-energized, an inspector put on the job, or the contractor required to do the job in a way that would not have necessitated either of the first two alternatives (N.T. 228). The accident took place during work on construction of the above-mentioned ditch 3–C at a point about 900 feet from the back of the Emilie Substation (see P–13),[5] which is located between the scene of the accident and Mill Creek Road, on which the Substation fronts.

B. Plaintiff started to work for the Levittown Supply Company on July 7, 1952, as a pipe layer or pipe fitter. William A. Jarvis was President of, and controlled the stock of, Levittown Supply Company, Crane Operating Company, Inc., and William A. Jarvis, Inc., which companies participated in the development of the Levittown area of Bucks County, Pa., during 1952 and 1953. The practice of Mr. Jarvis, as chief execu-

3. This paragraph of the letter also contained this language:
"Levitt will also assume the cost and perform the work of construction if changes in public roads or bridges are required by reason of construction of said ditch. Levitt further agrees that the material removed to construct the ditch will be evenly distributed on Electric's adjacent property so as not to trap water. Levitt will also, at its expense, install a driveway for trucks over the ditch running east and west across Electric's Emilie Substation property at a point to be designated by Electric's engineers.
"Levitt * * * hereby requests authority to commence such construction work. If such consent is given, Levitt agrees to enter into a written agreement

with Electric with respect to the performance of said construction work substantially as set forth above."

4. The sentence following this statement reads: "This consent is further conditioned upon your client's agreement to conduct the work in such manner as neither to interfere with the normal access to our property by our employees nor to endanger our facilities."

5. Although approximately 20 Philadelphia Electric employees went to and from the substation daily, since their material and equipment were stored in the front part of it facing on Mill Creek Road, there was only one employee there on a 24-hour basis and his duties were confined to the area within the substation's cyclone fence.

tive of the companies, was to use the men employed by any of the companies on any project where their services were needed, even though such project was being constructed by another company. The company carrying the employee on the payroll would pay its employee, but such company would be reimbursed by the company to whom the employee was loaned.[6] William A. Jarvis, Inc., entered into a contract with Levitt and Sons, Inc., to construct a drainage ditch known as 3–C (D–40).[7] Employees of the above-mentioned three companies worked on this 3–C project and compensation of personnel on the payroll of Levittown Supply Company and Crane Operating Company, Inc. (including Mr. Yatsko, the crane operator) who worked on this project was charged to, and paid for by, William A. Jarvis, Inc. by those companies (D–1 and N.T. 966, 971, 809–11, 849, 850–1). Mr. Allen testified that he was acting as general supervisor of this 3–C project for William A. Jarvis, Inc., at the time of this accident, even though he was on the payroll of Crane Operating Company, Inc. (N.T. 738). He identified the daily work sheets (D–1) covering this project, and showing that plaintiff, Mr. Yatsko, and the other employees were working on it, which sheets he prepared and on the basis of which the employees were paid by the company on whose payroll they were carried. Plaintiff never consented to work for any company other than Levittown Supply Company and neither knew that he had been loaned to William A. Jarvis, Inc., nor did he consent to work for that company. Mr. Coyne, who was on the payroll of William A. Jarvis, Inc., was the local foreman on this 3–C project with the usual supervisory and control powers of a foreman over all the personnel, with the exception of plaintiff (N.T. 681, 1017, 1118).

C. Work by plaintiff on this drainage ditch project started about two weeks prior to the accident. A crane with a shovel on the end had been digging out the ditch in which concrete pipe (5 or 6 feet in diameter) was laid. After a portion of the ditch had been dug by the crane, the bulldozer operator (Mr. Holliday) pushed the pieces of concrete pipe, which weighed 6 to 9 tons, down to the edge of the ditch with the bulldozer (P–128). Mr. Coyne and Mr. Weber hooked the crane cable (the shovel having been detached) through a hole in the center of the pipe to a bolt inside the pipe and told the crane operator (Mr. Yatsko) to raise the pipe with the crane and lower it into the ditch. Plaintiff's job was to see that the pipe was not broken and, with the help of the crane operator, fit each piece of pipe into the piece already laid, next to which it was to be placed. The Helmig brothers, and sometimes Mr. Galford, assisted plaintiff in getting each piece of pipe in position in the ditch. When the weight of the pipe was released from the boom of the crane as it was "eased" to the ground, the top of the boom would always rise to "some" extent, but the movement from the release of weight in this case would have been slight.

D. The body of the crane was parallel to the ditch while the pieces of pipe were being put into the ditch (P–17). The treads supporting the body of the crane were on wooden pads (P–24, P–18) to prevent the treads from sinking into the soft, marshy ground. The body of the crane was 4 or 5 feet from the edge of the ditch. As part of the drainage ditch project, it was necessary to clear the ground of underbrush and trees, to do excavation, and also to build a spillway,[8] as well as to lay the pipe. During the two days immediately preceding the day of the accident, plaintiff had been

6. Mr. Jarvis testified that he often loaned or rented his employees in this way to companies, of which he was not an officer, such as Levitt and Sons, Inc.

7. Mr. Jarvis testified that William A. Jarvis, Inc. did not sublet any part of the contract, but the work was done under its sole supervision and control.

8. Plaintiff helped with this work as requested by the other employees working on the project, but did not work hard at such work.

working on the spillway by helping to put up forms into which the concrete was poured.[9]

E. Since on May 1, 1953, the bulldozer broke down, Mr. Allen, the field boss,[10] came out to the scene of the work after lunch and plaintiff asked him about the overhead electric wires. Mr. Allen answered, "Jim, they are off." He said, "You got to get them pipes in right because we can't keep the power off."[11] In reliance upon this inaccurate statement of Mr. Allen made about 2 P.M., plaintiff went down in the ditch[12] and worked under the wires, which crossed the ditch at right angles. (Cf. P–6.)[13] The lowest of the three wires of the Philadelphia Electric Company (see footnote 1) was 44 feet 8 inches above the ground and the highest of these wires was 49 feet above the ground. The boom was set at such an angle that its top was about 10 feet below the lowest wire (N. T. 454–5, 1026–8) and the crane operator could only move the boom sideways in putting the piece of pipe in the ditch. Three pieces of pipe were successfully put in place in the ditch, parallel to each other, without incident prior to the accident. Immediately prior to the accident, plaintiff was standing in the ditch with the crane cab behind him and the boom[14] extending over his head out in front of him, lowering the fourth piece of pipe into the ditch. At first, plaintiff was giving directions to the crane operator with his hands and, when the piece of pipe was being pushed into place by him with a crowbar as it neared the ground, such directions were given by motions of plaintiff's head.[15] The Helmig brothers (one on each side of the piece of pipe, which was a couple of inches from the bottom of the ditch) were assisting plaintiff in pushing it in place. The end of this fourth piece of pipe was to fit into one of the three pieces which had already been placed in the ditch.

As plaintiff was pushing the fourth piece of pipe into one of the first three pieces with his crowbar pulled back against his chest, electricity from the overhead high tension wires came through the boom and wire cable into his crowbar and his body.[16] The crane oper-

9. The spillway was 200 feet to 400 yards from the location of the accident (N.T. 376).

10. The plaintiff testified that the extent of Mr. Allen's control over him was to tell him where to work, but that Mr. Allen could not hire him or fire him. He saw Mr. Allen every day. Mr. Allen testified plaintiff was under his supervision and he had the power to hire and fire him.

11. At a pre-trial deposition, plaintiff testified that Mr. Galford, whom he had known for 25 years, was present when Mr. Allen said to him, "Lay them pipe if it takes you all night because they got the power off." Mr. Allen testified that no such conversation took place. Both Mr. Allen and Mr. Coyne, the foreman of at least most of the workers on the job, testified that Mr. Allen had not been at the scene of this work from sometime before lunch until after the accident occurred. Mr. Allen testified that he had warned plaintiff and the other employees under his supervision to be careful of these wires on many occasions.

12. During the morning of May 1, under-

brush had been burned and plaintiff went down into the ditch about 2 P.M.

13. Mr. Jarvis testified that if he had known the electric current could have been turned off, he would have suggested to Levitt & Sons, Inc., to have it turned off.

14. Plaintiff had nothing to do with the movement of the 50 to 60 feet long boom.

15. The crane operator had to rely on plaintiff for signals.

16. The plaintiff testified at pp. 134–135:
"Well, I had three of the pipes in and I was putting the fourth one in. I had to put three in a row, rotation. The fourth one, I was pushing one into the other one, when all at once it just grabbed me and throwed my head back, and that is all I saw was fire.
"Q. Now, what grabbed you? A. The electric grabbed me and down I went. I just burnt up.
"Q. Well, how do you know you were being grabbed? What did you feel? What did you feel? A. Oh, the fire flew out of me every place. I was just burning up. I was buzzing like an airplane.

ator swung the boom out from under the wire to cut off the electric current from plaintiff's body. Burn marks were found near the top of the boom (see P–10) and on the undersides of the bottom and top wires. The bottom wire was burned through at least one of the seven strands of wire for a distance of approximately one foot, with lesser burns extending intermittently over an area of 10 feet. The top wire was burned over the burned area on the bottom wire.

F. Mr. Burriskey, Field Superintendent of Levitt and Sons, Inc., assigned to this 3–C project, testified that his duties were (1) to go out and check the line and grade of the ditch as given by his engineering department to see if the work was done as called for by the plans, and (2) to see whether enough progress had been made to warrant payment of requisitions by William A. Jarvis, Inc., for moneys claimed to be due for work done on the project. He did not exercise any supervision or control over the work on the project and had no authority over the workmen. However, he admitted that there could have been other employees of Levitt and Sons, Inc., in the field at the site of this project, such as engineers. Mr. Jarvis testified that Levitt and Sons, Inc., had daily inspections on the various jobs being done for them in the Levittown area.

Mr. Ludlow,[17] General Superintendent of construction of Levitt & Sons, Inc., sent notice under date of 1/28/53 to all contractors doing work for his company, including William A. Jarvis, Inc., cau-

tioning all equipment operators to be careful of all electric wires (DL–1 and DL–2). This notice was posted on the bulletin boards of William A. Jarvis, Inc., and their employees, other than plaintiff, were warned about the danger of such wires.

### Civil Action No. 16087

This action was brought by plaintiff against William A. Jarvis, Inc., and Philadelphia Electric Company.[18]

I. *Motion of William A. Jarvis, Inc., for a New Trial and for Judgment in Accordance with Its Motion for a Directed Verdict*

#### A. *Liability*

■ The area where this accident occurred and the instrumentalities, as well as the personnel using them, which conducted the electricity from the high tension wires to plaintiff's body were under the control of William A. Jarvis, Inc. (hereinafter called "Jarvis"). This travel of electricity for over 44 feet from a high tension wire to a person standing in a ditch below the level of the surrounding ground does not, "in the ordinary course of things," happen if those who are managing the instrumentalities and the personnel using them exercise due care. Under such circumstances, the Pennsylvania courts hold that the jury may infer negligence on the part of Jarvis. See Shafer v. Lacock, 1895, 168 Pa. 497, 504, 32 A. 44, 29 L.R.A. 254; Knox v. Simmerman, 1930, 301 Pa. 1, 4, 151 A. 678; First National Bank of McKeesport v. Simko, 1956, 384 Pa. 603, 605, 122 A.2d 47.[19] This principle has been ap-

"Q. Could you let go? A. I couldn't let go, no sir.
"Q. You say it threw your head back. What did that do then? A. Well, when I was pushing so hard to push the one pipe in the other, when it grabbed me it just throwed my head back, and that is all I could see was fire.
"Q. Fire where? A. Flying out of my eyes, every place, just buzzed like an airplane; so finally when it went off I just melted to the ground."

17. Mr. Ludlow also admitted that he was told to notify the Electric Company when the workers went on their property and,

further, that he had instructed either his secretary or the engineering department to give such notice. However, no evidence was offered to show that such instructions were carried out.

18. The various third-party actions and cross-claims filed in this action need not be considered as no objection to the disposition of these proceedings by the court's judgment of May 17, 1956, has been filed by motion or appeal.

19. See, also, Durning v. Hyman, 1926, 286 Pa. 376, 379, 133 A. 568, 53 A.L.R. 851, and Lesick v. Proctor, 1930, 300 Pa. 347, 350, 150 A. 618.

plied to injuries occurring during construction work. See Bisson v. John B. Kelly, Inc., 1934, 314 Pa. 99, 170 A. 139. It is particularly applicable in a situation such as this where this defendant knew the work was being done under high tension wires. See Ashby v. Philadelphia Electric Co., 1938, 328 Pa. 474, 478, 195 A. 887; Cooper v. Heintz Mfg. Co., 1956, 385 Pa. 296, 299, 304–305, 122 A.2d 699.[20]

■ Although the testimony produced by Jarvis was strong evidence of the exercise of due care by its employees, "the law does not require the elimination of every possible cause of the accident other than that on which plaintiff relies, but only such other causes, if any, as are fairly suggested by the evidence. [Citing cases.] Proofs to a degree of absolute certainty are rarely attainable; it is sufficient that they be such as to satisfy reasonable minds." See Saganowich v. Hachikian, 1944, 348 Pa. 313, 317, 35 A.2d 343, 345. The fact that no electricity was transferred from the wires to the boom when the former three pieces of pipe were placed in the ditch parallel to each other is not conclusive, since the jury could well have found that the necessity of fitting this fourth piece of pipe into one of the first three pieces was a more difficult job than had been involved in placing each of the first three pieces beside each other. There was ample testimony that the release of the weight of the pipe made the boom rise to some extent and that the crane was located on such marshy ground that pads were required for its support. Although it is a close case, I believe the jury was entitled to infer negligence which was the proximate cause of the injuries on the basis of the record.[21]

Furthermore, the plaintiff testified that he only performed this work under the high tension wires in reliance on Mr. Allen's inaccurate statement (see 145 F.Supp. at page 713, supra) that the current was off. The finding of liability on the part of Jarvis can be supported by such misrepresentation subjecting plaintiff to an unreasonable risk of bodily harm, irrespective of the legal principles stated in the two preceding paragraphs. See Robb v. Gylock Corp., 1956, 384 Pa. 209, 120 A.2d 174.[22]

## B. *Amount of Verdict*

In this suit based on diversity of citizenship, the legal rules followed by the Pennsylvania courts and by federal courts applying the Pennsylvania law must control in passing on the claim that

20. See, also, Reboni v. Case Brothers, Conn.1951, 78 A.2d 887.

21. The court's ruling (N.T. 1267) restricting any suggestion to the jury that the electricity might have reached the crane's boom as a result of a possible surge of electricity was based on the absence of any evidence in the record indicating that such a surge could have caused the passage of the electricity from the wire to the boom. A review of the record indicates to the trial judge that the above ruling is not a proper ground for a new trial. The improper use by plaintiff's counsel of the word "arcing" (N.T. 465) in questioning the crane operator without ever producing expert testimony to show when electricity would arc or that this witness had the expert knowledge required to use the term accurately may well have been a ground for withdrawal of a juror. However, the inaccurate meaning which the witnesses (the crane operator and Mr. Weber) gave to this word was to describe an area of electric flash which extended beyond the wire itself and beyond the boom itself (see N.T. 458–459, 472–475, where Mr. Yatsko described the first blue flash as 10 feet from the ground, rather than from the wire to the boom, 700, 1020–1, 1029–30) and not necessarily even such an area of flash extending from the wire to the boom (at N.T. 700 the crane operator repeated that he could not see the end of the boom and did not know where the electricity came from). Although it is a close question (it is noted that the crane operator first used the word "arc" voluntarily—N.T. 458), the trial judge does not believe that the suggestion in the jury's mind through the use of this word, which was not followed up by any competent testimony of arcing, is sufficient under all the circumstances to justify the granting of a new trial to either Jarvis or Levitt and Sons, Inc.

22. Cf. Nicolls v. Scranton Club, 3 Cir., 1954, 208 F.2d 874, 877.

the verdict is excessive.[23] See Coca-Cola Co. v. Dixi-Cola Laboratories, 4 Cir., 1946, 155 F.2d 59, 67, certiorari denied 1946, 329 U.S. 773, 67 S.Ct. 192, 91 L. Ed. 665.

In addition to the plaintiff's past expenses and past loss of earnings totaling $31,500, his future loss of earning power which can be estimated at $112,-000,[24] and his estimated future nursing, medical and related expenses of approximately $50,000,[25] the Pennsylvania appellate courts [26] hold that plaintiff is entitled to these items:

1. Adequate compensation for the permanent loss or impairment of limbs, organs, nerves, and other parts of the body;

2. Adequate compensation for past and future mental suffering resulting from physical injuries; and

3. Adequate compensation for past and future pain, suffering, humiliation and inconvenience resulting from his injuries.

Unless the amount of the verdict shocks the conscience of the court, a new trial should not be granted on the ground that the verdict is excessive.[27] Courts applying state tort law in the case of a plaintiff made an invalid for life by permanent injuries have in many, if not most, cases had their consciences shocked at verdicts substantially below $350,-000.[28] Although this verdict seems very high to the trial judge, even for these very extraordinary injuries,[29] the trial judge has determined, after a great deal of consideration of the matter, that a new trial should not be granted on the ground that the verdict is excessive. This decision is based on (1) the substantial loss of earnings suffered by the plaintiff, who was only 34 at the time of the accident; (2) his large past, and probably large future, expenses; (3) the large number of, as well as the unusual nature and extent of, the injuries suffered by the plaintiff; and (4) the extraordinary pain and

23. Most of the cases relied on by plaintiff's brief on this point are inapplicable as they are federal cases which did not involve the application of Pennsylvania law.

24. Reducing to present worth the figure of $7,200 per year, for which plaintiff contends at page 7 of this brief, at 6% for 33 years produces approximately $112,-000. There is evidence that plaintiff was a strong, exceptionally able workman, so that a finding of earning power expectancy of 33 years is not against the evidence. In view of the possibility of plaintiff's improving his status to that of foreman or superintendent and of the possibility of inflation, the $7,200 is not an excessive maximum amount for the jury to have used as an average for such 33-year period.

25. Plaintiff is confined to a wheelchair due to his impaired vision, lack of satisfactory prosthetic device for his right foot with consequent irritation of the flesh at the point of amputation, and dizzy spells (N. T. 478). The jury could well have found that additional help in the home (nursing or otherwise), medications, prosthetic devices and medical services (Dr. Elmer John Elias, a rehabilitation expert, believes plaintiff will not get better—N.T.

219) would cost $4,000 a year. (Plaintiff can see no improvement in his condition —N.T. 153-4.) If this annual sum for a 33-year period is reduced to present worth, on a 6% basis, the resulting figure exceeds $50,000.

26. See, for example, Burgan v. City of Pittsburgh, 1953, 373 Pa. 608, 96 A.2d 889.

27. Foresman v. Pepin, D.C.E.D.Pa.1946, 71 F.Supp. 772, 775, affirmed per curiam, 3 Cir., 1947, 161 F.2d 872; Whinney v. Reading Co., 1928, 95 Pa.Super. 135; Dempsey v. Hartley, D.C.E.D.Pa.1951, 94 F.Supp. 918, 921.

28. See, for example, Brewer v. Appalachian Constructors, W.Va.1953, 76 S.E.2d 916, 921, 925; Magee v. General Motors Corp., D.C.W.D.Pa.1953, 117 F.Supp. 101, 104; cf. McKinney v. Pittsburgh & L. E. R. Co., D.C.S.D.N.Y.1944, 57 F.Supp. 813; Burgess v. L. I. R. R., N.Y.L.J. 5/3/51 (N.Y.Sup.Ct., Trial Term, Kings County).

29. It is noted that damages of $287,450.40 were claimed in the complaint in Civil Action No. 16395, filed 2/16/54, which was subsequent to the plaintiff's leaving the Trenton hospital. During the trial, this figure was increased to $417,500 by oral motion of plaintiff's counsel.

suffering, including "terrific agony," [30] suffered by the plaintiff as the result of the occurrence of all these injuries at one time.

██ Because of the position taken by the lower court, and affirmed by the Supreme Court, in Riester v. Philadelphia Transportation Co., 1949, 361 Pa. 175, 62 A.2d 845,[31] which is the most analogous relatively recent Pennsylvania appellate court excessive verdict case the trial judge has been able to find,[32] there is being attached to this opinion an appendix enumerating the principal injuries of plaintiff and placing an approximate, maximum amount ($160,000) which the jury might have placed on such injuries.[33] It should be noted that no separate item is allocated to the pain, suffering, inconvenience and humiliation suffered by the plaintiff. However, these items of damage were considered by the court and jury in the cases cited in the appendix upon which the figure of $160,-000 is based, so that this approximate figure includes pain, suffering, humiliation, and inconvenience resulting from each of the particular injuries listed. The fact that all these injuries occurred to the same person at the same time is an additional reason for the extraordinary pain and suffering in this case.[34] It is noted that Levitt and Sons, Inc., does not contend that the verdict was excessive (see its Motions filed May 26, 1956).

II. *Plaintiff's Motion for New Trial as to Philadelphia Electric Company*

██ Plaintiff's motion for new trial is principally based on the modification of plaintiff's Point for Charge No. 12 by

30. Mrs. Doyle (one of his three nurses) emphasized the necessity of holding a cigarette between the plaintiff's lips until he would finally drop off to sleep, the falling off of the toes of his right foot "one at a time" as a result of the disintegration of the tissue and gangrene (which was also present in his chest and in his left leg), the purulent draining from his chest until he left the hospital at Trenton in December 1953, and concluded "it was really the saddest case I have ever had, I assure you all" (N.T. 439–442). Miss Carver (another nurse) described how "very painful" the changing of his dressings was (N.T. 443–445). Both nurses emphasized the phantom pains from his amputated leg and the painful feeling of wires sticking into his chest after the wire mesh had been inserted to support the chest wall. Dr. Elias testified that plaintiff had "very definitely" suffered a "substantial amount" of pain, as well as nightmares awakening him out of his sleep, in addition to the phantom pains (N.T. 220–222).

31. Cf. Potochnik v. Pittsburgh Rwys. Co., 1954, 379 Pa. 154, 108 A.2d 733, 738, and Broad v. Pennsylvania R. Co., 1947, 357 Pa. 478, 483–484, 55 A.2d 359.

32. Cf. Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825; Cooper v. Heintz Mfg. Co., 1956, 385 Pa. 296, 122 A.2d 699.

33. It is recognized that no two injuries are identical. The trial judge, however, has tried to apply the viewpoint in decisions, involving somewhat analogous injuries, of Pennsylvania courts and federal courts, which were applying Pennsylvania law, to the injuries present in this case. In some cases, federal court decisions applying New Jersey and Nevada law have been used because of their greater similarity to the plaintiff's injuries than any available Pennsylvania decisions.

34. Items of past pain and suffering include complete loss of sleep for long periods of time, the hemorrhaging in his chest, and the pain involved in learning to stand and move about with support, which caused nervousness, dizziness, and perspiration all over his body. After leaving the hospital at Trenton, it proved necessary to take plaintiff to the Hasbrouck Heights Rehabilitation Center in order to teach him to stand and to try to walk, but he still has to grasp the wall or a chair to steady himself in order to move without his wheelchair. These factors, together with the items mentioned in footnote 30, caused plaintiff's weight to drop to 80 lbs. (a loss of approximately 100 lbs.). Items of continuing pain, suffering, inconvenience and humiliation include the phantom pains (burns and itches in the portion of his left leg that has been amputated), the frequent waking at night from spasms of plaintiff's left leg (vesiculation), the pain from the breakdown of tissue of the right foot due to unsatisfactory prosthesis, inconvenience and humiliation incident to his fainting spells, dizziness and periods of coma, and the constant ringing in his ears and buzzing in his head.

stating that the electric company "cannot necessarily exonerate" itself from liability by having requested the possessor of the land to notify it when work was to be begun and that the failure of Levitt and Sons, Inc., to give notice in accordance with its agreement (see paragraph A of facts above) "would not necessarily be a defense" to the electric company. The court inserted the word "necessarily" in the above-quoted language because the jury should consider, in determining whether the electric company had used the highest degree of care required of it, that this company had given Levitt and Sons, Inc., a right of way to build the ditch under the wires, with the proviso that it be notified when the work started. There are many situations in tort law where the actions of another must be considered in determining the reasonableness of a person's conduct in performing a non-delegable duty, even though such actions do not relieve the person of the duty completely. See, for example, Tollisen v. Lehigh Valley Transportation Co., 3 Cir., 1956, 234 F.2d 121. A careful review of the portion of the charge [35] covering the liability of the Philadelphia Electric Company shows that it is in accordance with the Pennsylvania appellate court decisions and the record amply supports the jury's finding that this company used the highest degree of care practicable under all the circumstances of this case. See Reed v. Duquesne Light Co., 1946, 354 Pa. 325, 47 A.2d 136; Jowett v. Pennsylvania Power Co., 1955, 383 Pa. 330, 335, 118 A.2d 452; cf. Grace v. Henry Disston & Sons, Inc., 1952, 369 Pa. 265, 85 A.2d 118.

## Order

And now, this 5th day of October 1956, it is ordered that the motions of William A. Jarvis, Inc., for a new trial and for the entry of judgment in its favor against plaintiff and the motion of plaintiff for a new trial on his claim against the Philadelphia Electric Company are denied.

## Civil Action No. 16395

This action was brought by plaintiff against Crane Operating Company, Inc. and Levitt and Sons, Inc. Levitt and Sons, Inc. filed third-party complaints against Jarvis and Levittown Supply Company, as well as a cross-claim against Crane Operating Company, Inc.[36]

### I. Motion of Crane Operating Company, Inc. for a New Trial

As pointed out under subdivision B (145 F.Supp. at page 711, supra), Mr. Jarvis was the chief executive in charge of the work on the 3–C project in his capacity as President of Jarvis. Mr. Allen acted willingly as general superintendent of this project for Jarvis, even though he knew he was paid by Crane Operating Company, Inc. (hereinafter called "Crane"). Mr. Coyne (a regular Jarvis employee) acted as foreman of all the Crane and Jarvis employees on this job [37] and at least one Jarvis employee, as well as Crane employees, worked on the crane itself.[38] The only employees on Crane's payroll who could have been responsible for negligence which was a

---

35. N.T. 1435–1439.

36. The last two third-party actions need not be considered here as no motion has been filed in the action concerning Levittown Supply Corporation and the finding that Levitt is responsible for active and primary negligence removes the possibility of its having any ground for indemnity at law against Crane (see footnote 74 below).

37. The plaintiff admitted that Mr. Coyne was foreman of all the other personnel

but not of himself (see N.T. 1020, showing Coyne was supervising the work at the time of the accident). In view of the jury's answer to question 5 (see footnote 2) and plaintiff's testimony that Mr. Allen only told him where to work, whereas Mr. Coyne had no supervisory control over him whatsoever, plaintiff cannot be considered as a loaned employee on this project.

38. Mr. Robert Helmig, who was on Jarvis' payroll, acted as oiler on the crane. Also, Mr. Probst acted as oiler

proximate cause of this accident were Mr. Allen, Mr. Yatsko and Mr. Probst.[39]

 The overwhelming evidence indicates that Messrs. Yatsko, Allen and Probst were subject to the direction and control of Jarvis as to the manner of performing this work, as well as to where the work was to be done.[40] They were clearly acting in the business of Jarvis. The most logical inference from the evidence is that these three men consented to be loaned to Jarvis during this job.[41] Under such circumstances, the Pennsylvania courts have consistently held that such loaned employees are servants of Jarvis, who alone becomes liable for any negligence of the loaned employees on this 3-C project. Bojarski v. M. F. Howlett, Inc., 1928, 291 Pa. 485, 491–492, 140 A. 544;[42] McGrath v. Edward G. Budd Mfg. Co., 1944, 348 Pa. 619, 623–624, 36 A.2d 303; McConnell v. Williams, 1949, 361 Pa. 355, 359, 65 A.2d 243; Wall v. Penn Lumber & Mill Works, 1952, 171 Pa.Super. 512, 515, 90 A.2d 273.[43] These cases emphasize that the primary tests for the purpose of determining liability under the doctrine of respondeat superior is who has the power to direct and control the work of the employee on the specific project and whose business is being performed.[44]

39. Mr. Yatsko testified that Mr. Probst, as well as Mr. Weber, advised him on the proper angle of the boom.

40. Jarvis had a skilled crane operator on its payroll but he was busy on another project at the time this accident occurred. Exhibit D–1 shows that a Mr. McDermott worked as crane operator on this project until April 23 and Mr. Yatsko took over this job after that date, but the same crane (No. 117) was used from April 15, when a crane was first used on this job, until July 3, which was the last day a crane was used on the job. The testimony of Jarvis' President makes clear that he was competent to give the crane operator (Mr. Yatsko) directions as to his work.

41. See Sames v. Borough of Perkasie, 1930, 100 Pa.Super. 402, 407; 1 A.L.R.2d 303 and 35 Am.Jur. 456. The question of whether or not the particular employee consented to be loaned to the employer is not emphasized or discussed in the most recent Pennsylvania cases considering the liability of the borrowing employer and the regular employer under the doctrine of respondeat superior, as opposed to the cases involving liability under the Workmen's Compensation Act, 77 P.S. § 1 et seq. such as Quick v. Allegheny Construction Equipment Co., 1949, 361 Pa. 377, 65 A.2d 238, relied on by plaintiff. See, for example, the cases cited in this part of the opinion, particularly those in footnote 44 below. Furthermore, the Quick case is inapplicable on its facts to the three employees of Crane.

42. See language of Chief Judge Kirkpatrick, recognizing the binding effect of this decision in a case involving facts similar to this case in Bowser v. Publicker Industries, Inc., D.C.E.D.Pa.1951, 101 F.Supp. 386, 387, affirmed per curiam, 3 Cir., 1951, 192 F.2d 933.

43. See, also, Benedict v. Bondi, 1956, 384 Pa. 574, 122 A.2d 209; Hoffman v. Montgomery County, 1941, 146 Pa.Super. 399, 402, 22 A.2d 762; Dickerson v. American Sugar Refining Co., 3 Cir., 1954, 211 F.2d 200, 202–203; Shaw v. Monessen Southwestern Ry., 3 Cir., 1953, 200 F.2d 841, 843. Cases such as Mature v. Angelo, 1953, 373 Pa. 593, 97 A.2d 59, and Pennsylvania Smelting & Refining Co. v. Duffin, 1950, 363 Pa. 564, 70 A.2d 270, 17 A.L.R.2d 1384, are distinguishable since the alleged borrowing employer did not acquire or assume the right to exercise control over the employee and the right to control remained in the regular employer. As stated above, the overwhelming evidence in this case is to the contrary.

44. In the McConnell case, supra, the court used this language, 361 Pa. at page 359, 65 A.2d at page 245:
"1. In determining whether a person is the servant of another, the essential test is whether he is subject to the latter's control or right of control with regard not only to the work to be done but also to the manner of performing it. [Citing cases.] The true criterion is the existence of power to control the employee at the time of the commission of the negligent act. [Citing cases.]
"2. A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services; he may become the other's servant as to some acts and not as to others. Rest.Agency, § 227. The important question is not whether he remains the servant of the general

■ Since the great weight of the evidence is only consistent with the conclusion that the regular employees of Crane who were working on this project were loaned employees of Jarvis at the time of the accident, it is the duty of the court to direct a new trial of the suit of plaintiff against Crane, even though the jury found that Crane was actively negligent and that such negligence was a substantial factor in causing the injuries of plaintiff.[45]

II. *Motions of Levitt and Sons, Inc. for Judgment in Accordance with Its Motion for a Directed Verdict and For a New Trial (Paragraphs 4–6 of Levitt's Motion for New Trial Filed May 26, 1956)*

After reading question 1(c) to the jury (see footnote 2 at page 710 of 145 F. Supp., supra), the charge continued:[46]

"As to Question 1(c) the basic principle of law involved is that the failure to act may be negligent if the person whose duty it is to act realizes or should realize that his omission will prevent a third party from taking action which is necessary for the aid or protection of another."

■ Sections 305 and 327 of the Restatement of Torts adopt the legal principle that an act may be negligent if the actor realizes that it is likely to prevent a third person from taking action which the actor realizes is necessary for the aid or protection of the other.[47] The

---

employer *as to matters generally*, but whether, as to the *specific transaction in question*, he is acting in the business of, and under the direction of, the one or the other: § 227, Comment a. Where one person lends his servant to another for a special employment the test is whether, *in the particular service he is engaged to perform*, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired. [Citing cases.] "

In the Wall case, the court stated, 171 Pa.Super. at page 515, 90 A.2d at page 274:

" * * * the element of control or power to control the employe at the time of the accident is the crucial or vital consideration. [Citing cases.] 'Where it is established that the temporary master has control over the work to be done and the manner of doing it, he alone is liable for compensation for the accidental death of a workman' ".

45. The court has not overlooked the fact that Crane's answers to interrogatories of Levitt stated that there were no "safety devices" on the crane. Even if such evidence had been offered in plaintiff's case, such a statement is not in itself sufficient evidence to justify an inference of negligence on the part of Crane (as opposed to Jarvis, who had rented the crane) where there is no evidence of what safety devices are referred to, whether they are usually present on cranes being used under high tension wires, etc. (cf. N.T. 1163–1165.)

46. The trial judge went out of his way to

point out this legal principle to counsel for Levitt and·Sons, Inc. during the trial before the presentation of the argument to the jury, so that such counsel could present their argument with knowledge of the trial judge's views.

47. Section 327 provides, inter alia:
"One, who * * * should know that a third person * * * is immediately about to give to another aid necessary to his bodily security, negligently prevents or disables the third person from giving such aid, is liable for bodily harm caused to the other by the absence of the aid which he has prevented the third person from giving."

Cf. cases cited in footnote 6 of "Recent Case," 89 U. of Pa.L.Rev. 533, 534 (1941). Both plaintiff and this defendant rely on Kirstein v. Philadelphia & Reading Ry. Co., 1917, 257 Pa. 192, 101 A. 338, 5 A.L.R. 1646, where the defendant was held not liable for a 10 to 13 minute delay of fire engines en route to put out a fire on plaintiff's property resulting from obstruction of a grade crossing. There was no showing that the defendant could foresee the need to use the crossing at the time by fire engines. The court said, 257 Pa. at page 195, 101 A. at page 338:

"When it is sought to charge a railroad company with negligence for allowing such obstruction as here occurred, it is first of all essential that it be made to appear that those in charge of the trains, who were directly responsible for their control, knew or ought to have known when they were employing or about to employ the crossing with their trains of the unforeseen conditions existing which

Pennsylvania appellate courts have adopted the principle that there is "a duty to safeguard life and limb * * * (from) consequences of negligence (which) may be foreseen" irrespective of any contractual obligation. See Maize v. Atlantic Refining Co., 1945, 352 Pa. 51, 54, 41 A. 2d 850, 160 A.L.R. 449.[48] The court also used this language in the Maize case, supra, 352 Pa. at page 56, 41 A.2d at page 852:

> "This court has laid down the rule that any one who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must 'impose a measure of control that is adequate to the protection of human beings' from it. * * * 'While no absolute standard of duty in dealing with such agencies can be prescribed, it is safe to say, in general terms, that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken.'"

In accordance with the views expressed in the Maize case, supra, the Pennsylvania Superior Court recently held a contractor liable to a member of the public for injuries sustained from work improperly done. See Krisovich v. John Booth, Inc., 1956, 181 Pa.Super. 5, at pages 9–11, which reviews the Pennsylvania cases.[49]

Exhibits DL–1 and 2, containing the warnings of Levitt and Sons, Inc. to its contractors of the danger of electric wires, make clear that this company knew of the danger of operating under such wires. The stakes put in by this company's engineering department in accordance with the plans of the 3–C project showed that the ditch went under these wires (see N.T. 1073 and 1107). Under such circumstances, the Pennsylvania Supreme Court has indicated that, with such knowledge, the possessor of land may be found negligent by a jury in not taking affirmative action to decrease the risk (e. g., by having the wires raised, if not by having the current turned off), even though the work is being done by an independent contractor who is fully cognizant of the dangerous electric condition. See Commonwealth Trust Co. of Pittsburgh v. Carnegie-Illinois Steel Co., 1945, 353 Pa. 150, 154, 44 A.2d 594.[50]

made such employment, or use of the crossing likely to cause the injury for which recovery is sought."
Cf. American Sheet & Tin Plate Co. v. Pittsburgh & L. E. R. Co., 3 Cir., 1906, 143 F. 789.

48. The court continued by quoting from Justice Maxey, as follows, 352 Pa. at pages 54–55, 41 A.2d at page 852:
"'One duty imposed by law is to use due diligence to avoid causing harm which an individual has no legal right to inflict upon another. This duty is breached by any legally harmful act or omission * * *. Holmes in "The Common Law," page 145, says: "Most liabilities in tort * * * are founded on the infliction of harm which the defendant had a reasonable opportunity to avoid at the time of the acts or omissions which were its proximate cause."'"

49. In Bisson v. John B. Kelly, Inc., 1934, 314 Pa. 99, at page 110, 170 A. 139, at page 143, the Pennsylvania Supreme Court said:
"The duty defendant breached was a duty imposed by law, not a duty self-imposed by contract. It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen. The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from those acts or omissions is for the jury, if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of neglect of duty."

50. Levitt and Sons, Inc. had the power to have safety precautions taken by the Philadelphia Electric Company of the type suggested by the Commonwealth Trust Co. decision or of the alternative methods suggested by Mr. Roth (page 5 above). Under similar circumstances, the Connecticut Supreme Court of Errors has

The trial judge concluded from the decisions cited above that the above-mentioned legal principle exemplified in §§ 305 and 327 was the law in Pennsylvania on the facts of a case such as this,[51] where Levitt and Sons, Inc. (hereinafter called "Levitt") had every reason to believe that the Philadelphia Electric Company would take no action for the protection of these workmen at this remote spot, about 300 yards behind the back of the substation, until it received notice from them in accordance with the letter of September 12, 1952 (P–26).

It should also be noted that in this case defendant Levitt had an independent contractual duty to notify the electric company, in addition to the duty arising under the Pennsylvania tort law as described in the foregoing cases. Levitt, through accepting the condition imposed by the Philadelphia Electric Company that Mr. Roth be notified prior to entry on their land, undertook a contractual duty of giving such notification.[52]

The last sentence of Comment a to Section 328 indicates that where the defendant's act (in this case, the omission) is in itself a wrong such as a breach of an independent duty, the liability to the other arises "irrespective of the actor's knowledge of the third person's purpose" or intended action to help the other. Even though Levitt did not know the exact action which Mr. Roth would take upon receipt of such notice, there was ample evidence (see subdivision A, 145 F.Supp. 711, supra) from which the jury could find that the failure to fulfill the duty to give notice was a proximate contributory cause of the injuries.

Defendant Levitt further claims that the negligence of Jarvis after having received a warning notice and the misrepresentation by Allen constituted an intervening cause absolving it from any liability for its negligence in not notifying the Philadelphia Electric Company of its entry on the land.

■ But an intervening negligent act is not always a superseding cause which relieves an antecedent wrongdoer from liability for negligently creating a dangerous condition which results in injury. Roadman v. Bellone, 1954, 379 Pa. 483, 492, 108 A.2d 754; Styer v. City of Reading, 1948, 360 Pa. 212, 61 A.2d 382; Diehl v. Fidelity-Philadelphia Trust Co., 1946, 159 Pa.Super. 513, 49 A.2d 190.

The case of Stone v. Philadelphia, 1931, 302 Pa. 340, 153 A. 550,[53] which defend-

held that negligence may be inferred by the jury where there was a failure to secure the de-energization of the wires. Reboni v. Case Brothers, Conn.1951, 78 A.2d 887.

51. The Pennsylvania Supreme Court has emphasized that the important test in determining tort liability is the foreseeability of the harmful results of conduct, using this language in Hudson v. Grace, 1943, 348 Pa. 175, 177, 34 A.2d 498, 499, 150 A.L.R. 366:

"Human life is so complex that the circumstances attending the happening of different accidents are correspondingly varied, but the principle which determines the imposition of liability is simple and constant, being based on the proposition that one who, by substandard conduct, causes injury to another is legally responsible therefor if the harmful consequences of such conduct could reasonably have been foreseen."

52. Mr. Roth's letter (P–26) constituted a counter-offer, Restatement of Contracts, §

60, Selig v. Philadelphia Title Insurance Co., 1955, 380 Pa. 264, 271, 111 A.2d 147, which the testimony of Mr. Ludlow (see subdivision A, 145 F.Supp. 711, supra; also N.T. 1099–1100) makes clear had been accepted by Levitt & Sons, Inc. prior to any work being done in the field. Furthermore, the execution of the contract with William A. Jarvis, Inc. and the addendum of April 8, 1953, constituted such an exercise of dominion over the 3–C project by Levitt as to be an acceptance of this counter-offer. See Restatement of Contracts, § 72(2), which has been followed in the Pennsylvania appellate decisions. Gum, Inc., v. Felton, 1941, 341 Pa. 96, 102, 17 A.2d 386. See, also, 1 Williston on Contracts (Rev. Ed. 1936), § 91 et seq.; Blaisdell Filtration Co. v. Bayard & Co., 1933, 311 Pa. 6, 10, 166 A. 234.

53. Professor L. H. Eldredge has pointed out in Modern Tort Problems (Geo. T. Bisel Co., 1941, at p. 217 ff.) that the Stone case, supra, completely overlooked a

ant cites in support of its contention that an intervening negligent act operates as a superseding cause and insulates an antecedent tortfeasor from liability, has been greatly modified by these decisions.

It has been consistently recognized that, under Pennsylvania law, intervening human action which causes a foreseeable and not highly extraordinary result "is not a superseding cause of harm which an actor's conduct is a substantial factor in bringing about". Di Gironimo v. American Seed Co., D.C.E.D. Pa.1951, 96 F.Supp. 795, 796, and cases there cited.

Levitt could well have foreseen that plaintiff would have gone down into the ditch, even though the alleged misrepresentation by Mr. Allen was not made. It was not highly extraordinary that the plaintiff should have worked in the ditch under the wires and that electricity should have been conducted to him by the crane's boom. As stated in the case of Bowser v. Publicker Industries, D.C.E.D.Pa.1951, 101 F.Supp. 386, affirmed per curiam on lower court opinion, 3 Cir., 1951, 192 F.2d 933, when a crane is in operation near live electric wires, it is not highly extraordinary that the process of continual movement will result in contact with such wires, causing injury to those working nearby. Thus, such negligence by Jarvis does not serve as a superseding cause for Levitt's negligence. The negligence of Levitt operated directly, separately and continually upon the plaintiff. The intervening negligence, as here occurred, did not negative the original negligence that permitted the current to remain in the wires and prevented other safety precautions which might have been taken, such as having the wires moved to a safer location.[54]

The following alleged errors of the trial judge, relied on by Levitt as grounds for a new trial (see paragraph 6 of motion filed May 26, 1956), will be considered briefly:

1. Admission of conversations concerning inability to de-energize electric wire at a different place and on a different occasion (sub-paragraphs f, i, h, r and d)

On cross-examination by counsel for plaintiff, Mr. Jarvis explained that at a deposition taken prior to trial he had testified that he did not request the electricity to be turned off on or before May 1, 1953, because Levitt's superintendent informed him about a year before this accident, in connection with work at a different location in the Levittown area, that it was impossible to have electricity in overhead wires turned off, even though work was going on which might involve contact with such wires (N.T. 827–30).[55]

line of Pennsylvania cases which rejected the theory that intervening negligence prevented redress from the original wrongdoer.

54. Cf. Commonwealth Trust Co. of Pittsburgh v. Carnegie Illinois Steel Co., 1945, 353 Pa. 150, 154, 44 A.2d 594.

55. Mr. Jarvis had testified that the superintendent of Levitt told him that where there were unsafe operating conditions, Jarvis was to contact Levitt and they would contact the electric company and have the required safety measures taken (N.T. 819). He then denied that he had been told by Levitt that it would be impossible to cut off the current from these wires (N.T. 821) and counsel for plaintiff confronted him with his testimony in the deposition of July 16, 1954, that his company understood from Levitt's superintendent that a request to have the electricity turned off was impossible (N.T. 827–8, cf. 817–8). A witness, particularly a party, may always be cross-examined as to a prior inconsistent statement, even though the attorneys for some of the parties were not present when such prior statement was made. 2 Henry on Evidence (4th Ed. 1953), §§ 801 and 815. Professor Moore points out at § 26.7 of Vol. 4 of his book on "Federal Practice" (2nd Ed.): "But a deposition may be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness, irrespective of whether parties other than the one taking the deposition were present or represented at the taking of the deposition or had due notice thereof." Cf. Lewis v. United Air Lines Transport Corp., D.C.D.Conn.1939, 27 F.Supp. 946, 947–948; Drum v. Town of Tonawanda, D.C.W.D.N.Y.1952, 13 F.

When the trial judge discovered that this conversation with Levitt's superintendent had involved a different location and date, he instructed the jury to "completely disregard" this testimony on motion of Levitt's counsel (N.T. 831 and 841).[56] At 9:45 A.M. on the next day of the trial, this ruling was reaffirmed in chambers and the trial judge said:

"And I direct that no further mention of this statement in the deposition shall be made by any counsel at any time during the balance of the trial.

"Now, this ruling does not preclude any counsel from cross-examining Mr. Jarvis as to other conversations he may have had with representatives of Levitt & Sons, Inc., provided that a proper foundation is laid, specifying the person, time and place of the conversation, and that it concerned safety procedures with respect to high tension wires, and a factual situation comparable to that involved in this case." (N.T. 877)

(See, also, restatement of court's position at 883–884 and 888, 892.) In spite of the fact that counsel for Levitt reiterated at considerable length his desire to keep this conversation out of the record (N.T. 886–887), he violated the trial judge's instruction by asking Mr. Jarvis questions concerning this conversation (N.T. 913–4, 918–923) after counsel for plaintiff had adhered to the court's ruling by discontinuing questions concerning this conversation (N.T. 902). Under these circumstances, the trial judge granted the application of counsel for plaintiff during his rebuttal to question Mr. Jarvis on this conversation on principles of basic fairness and in order to clarify the evidence on this point (N.T. 1145–52, 1179–80, 1184). In order to expedite the trial so that the jury would not be hurried in their consideration of the several questions (see footnote 2) for their consideration,[57] and in order to avoid confusion of the jury by the introduction of irrelevant testimony [58] at the very close of the submission of evidence, the court took the additional testimony of Mr. Jarvis outside the presence of the jury, giving all counsel full opportunity for cross-examination, and read to the jury the testimony concerning this conversation (N.T. 1211–15).[59] It should be not-

R.D. 317, 319. For this reason, counsel for Levitt's objection to the use of the deposition taken without notice to them is not valid insofar as this use of this deposition is concerned. It should be noted also that the trial judge repeatedly cautioned the jury that the depositions taken July 16, 1954, were not admissible against Levitt. Cf. F.R.Civ.P. 26(d).

56. The importance of eliminating "tangential matters" from the trial has recently been emphasized by an able and experienced federal judge. See "Expedition of Civil Cases," by Hon. Alexander Holtzoff, Legal Intelligencer of 9/26/56, p. 5.

57. The trial judge was advised by counsel on the day the jury was sworn that the case would not take over a week (N.T. 11–12) [even though it lasted from May 4 through May 17, with one business day's interruption (May 14) due to a scheduled argument list], so that he did not insist on his suggestion that alternate jurors be selected. Counsel were unwilling to agree to proceed with less than 11 jurors and by May 15, one juror had been excused due to a serious operation on a child. The normal term for this jury expired May 11. One of the remaining jurors had sent word to the trial judge that, due to a contemplated move to a new house, she needed to be excused as soon as possible (N.T. 980, cf. 1356). There were, therefore, strong reasons to submit the case to the jury as promptly as was feasible.

58. If the entire testimony of Mr. Jarvis had been given before the jury, it would have included an alleged conversation with Mr. Ludlow (superintendent of Levitt) in the hall (N.T. 1160) and other collateral, irrelevant matters concerning the United States Army Engineers' safety procedures under high tension wires, the feasibility of dynamiting near high tension wires, etc. (N.T. 1163–1172.)

59. Although counsel for Levitt objected to the procedure followed by the trial judge in general, his only specific objection to the proposed reading to the jury of this testimony, which was in the nature of a deposition, prior to such reading, was a reference to a Mr. Paulson

ed that Mr. Jarvis had already been subject to vigorous and lengthy cross-examination in the jury's presence (N.T. 811–860, 902–952), so that the jury had a great deal of opportunity to judge his perception, memory, accuracy, and credibility. Under such circumstances, this procedure does not seem to the trial judge to be a proper basis for a new trial.[60]

2. Failure of charge to refer to testimony of Mr. Ludlow (subparagraphs a and d)

At the conclusion of the charge, counsel for Levitt made requests that the charge be supplemented covering eight pages (N.T. 1473–1480). The trial judge believes that such lengthy requests for supplements to the charge are not contemplated by the last two sentences of F.R.Civ.P. 51, particularly where the trial judge had explained, in advance of counsels' arguments to the jury, to the attorneys for Levitt the legal theory of possible liability of Levitt which was going to form the basis of his charge (N.T. 1253). The first sentence of F.R.Civ.P. 51 contemplates that counsel include in their written requests for charge the material they wish to have covered in the charge. The material covered by the above-mentioned 8 pages was not included in Levitt's points for charge filed May 16, 1956.

Mr. Ludlow, superintendent in charge of construction of Levitt, testified that he instructed his secretary or the engineering department to notify the electric company that "we were ready to go in" the electric company's property, but no testimony was produced that any such notice was given to the electric company.[61] Mr. Ludlow testified that it was not unusual for a property owner to request notice be given him when work was to be done on its land and he did not know that the electric company wanted notice so that it could turn off the current when work was being done under its high tension wires (N.T. 1100–1104). Levitt objects that such testimony was not mentioned in the court's charge, even though it had been carefully pointed out to the jury in the argument of Levitt's counsel (N.T. 1361).[62]

The trial judge recognizes that his charge might have been more complete but does not believe that any harmful error resulted from his omission to refer again to this testimony which had been so ably called to the jury's attention by Levitt's counsel.[63] It seemed to the trial

(N.T. 1207–1208, 1210–1211). The trial judge complied with this request and, after the reading had taken place, the co-counsel for Levitt raised additional objections, including the deletion of Mr. Paulson's name, which had been previously requested by his colleague (N.T. 1217–1219).

60. See F.R.Civ.P. 26(d) (3) (5), providing that even depositions may be used in "such exceptional circumstances * * * as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court". Cf. Klepal v. Pennsylvania Railroad Co., 2 Cir., 1956, 229 F.2d 610, 612; Holt v. Werbe, 8 Cir., 1952, 198 F.2d 910, 917; Odell v. Miller, D.C.W.D.Mich.1950, 10 F.R.D. 528, 529.

61. In view of this testimony at 1108–1109, any error in the court's sustaining Mr. Foley's objection at N.T. 1103 is harmless. Contrary to the statements made at page 30 of Levitt's brief, Mr. Ludlow testified very clearly that he knew the electric company was notified because he gave instructions that they be notified (N.T. 1103) and at N.T. 1108–1109 he gave the information as to the persons to whom he had given instructions. There is no indication whatsoever in the record that Levitt could not produce the testimony of such employees.

62. The trial judge had informed counsel prior to their speeches that he would not summarize the facts in his charge and they should cover them in their arguments to the jury (N.T. 1232).

63. In order to explain the legal principle, it was necessary to comment on Mr. Roth's testimony that he expected to take protective action when work was done near these wires, since it was his company which had written the condition in the letter (P–26) and knew what action they would take when the notice was received (see 145 F.Supp. 711, supra). Mr. Jarvis' testimony had a direct bearing on the reasonable character

judge that any supplement to his charge would tend to favor the party requesting the supplement and that the jury would probably retain a clearer view of the most important points for their consideration if they were not burdened by further instructions.[64]

3. Wording of special questions (subparagraph q).

■ Levitt's motion for new trial contends that these questions (see footnote 2) were vague, indefinite, confusing in character, and inadequate. At the pre-trial conference on January 18, 1956, the trial judge stated that in his opinion it would be best to have special questions submitted to the jury and suggested that counsel for Levitt, among others, submit such questions to him by February 20, 1956 (pp. 5–7 of transcript of pretrial proceeding). On the day the jury was selected (May 4, 1956), the court requested counsel to submit drafts of such suggestions by noon on May 8, 1956 (N.T. 29). On at least three other occasions [65] the trial judge asked counsel to submit to him drafts of such questions, but at no time did counsel for Levitt either suggest such questions or make any concrete proposal for the rewording of the draft of questions (C–2) submitted to all counsel by the trial judge at 10 A.M. on the morning of May 16, 1956 (N.T. 1114). All the other counsel

made definite suggestions as to phraseology and have filed no objections to the wording of the questions. After careful consideration of these questions, the trial judge does not believe the wording of the questions, when read in connection with the charge, is a proper ground on which to grant Levitt a new trial under the circumstances of this case.

The other reasons [66] for a new trial alleged in paragraph 6 of the motions filed May 26, 1956, have been carefully considered and rejected.

III. *Motion of Levitt and Sons, Inc. to Vacate the Judgment Against It and In Favor of William A. Jarvis, Inc. and to Enter Judgment in Favor of Levitt and Sons, Inc. and Against William A. Jarvis, Inc. on Its Third-Party Complaint (Paragraphs 1 & 2 of Motions Filed May 26, 1956)*

Paragraph 4 of the contract between Levitt and Jarvis covering the work to be done on the 3–C project (D–40) provides as follows:

"The Contractor agrees to indemnify and save the Company harmless from any and all claims, suits, causes of action, judgments or damages (including damages for care and loss of services because of bodily injury, sickness or disease, including death resulting therefrom) sustained by it or any person or per-

---

of one of the alternative courses described by Mr. Roth. Also, Mr. Ludlow's testimony was certainly not as definite nor as clear as that of Mr. Roth and Mr. Jarvis.

64. The charge had taken more than an hour-and-a-half (10:30 A.M. to 12:15 P.M., N.T. 1458). At least one of the attorneys agreed with the court's view that the charge should not be supplemented (N.T. 1482).

65. On May 11, drafts of questions were requested to be submitted by 2 P.M. on May 14, 1956 (N.T. 872). On May 15, 1956, the trial judge stated that drafts of such questions would be received with appreciation as soon as this was feasible (N.T. 890–1). In answer to counsel for Levitt's general objection to the draft of questions submitted by the trial judge, the court again requested

suggested questions from such counsel (N.T. 1225). The trial judge recognizes that the exact wording of the questions may have to await the evidence introduced, but counsel should at least have some specific wording to suggest by the conclusion of the evidence if they wish to ask for a new trial on the basis of the questions as phrased.

66. On the evidence in the record, no jury could properly find that Jarvis had either assigned its contract with Levitt (D–40) or employed subcontractors for the prosecution of the work. See facts summarized in paragraph B on 145 F.Supp. 711, supra, and in I of Civil Action No. 16395, 145 F.Supp. 718, supra, as well as N.T. 803, 809 and 844–849. For this reason, any argument to the jury on this subject would have been improper, as well as confusing.

:sons, and because of injury to, or destruction of, property (including the loss of use thereof) caused by, arising out of, or resulting from, any act or omission of the Contractor, his agents, servants and employees."

The law of New York governs the construction to be placed upon the above-quoted language.[67]

The New York Court of Appeals has consistently held that indemnity clauses of the type quoted above will not be construed to indemnify a party against his own negligence "unless such intention is expressed in unequivocal terms." See Thompson-Starrett Co., Inc., v. Otis Elevator Co., 1936, 271 N.Y. 36, 2 N.E.2d 35.[68] The New York Court of Appeals has also applied this principle in refusing to interpret an indemnity clause to save harmless the indemnitee where his own active negligence has been a cause of the damages. See Schwartz v. Merola Bros. Construction Corp., 1943, 290 N.Y. 145, 48 N.E.2d 299;[69] Semanchuck v. Fifth Ave. & Thirty-Seventh St. Corp., 1943, 290 N.Y. 412, 49 N.E.2d 507;[70] cf. Kingsland v.

---

67. Paragraph 11–b of the contract provides that:

"This Agreement and any of its terms or provisions shall be interpreted and construed according to the laws of the State of New York."

The courts have generally indicated that a provision in a contract stating that the law of a state in which one party is domiciled shall govern its interpretation, will be enforced if (1) its enforcement is not a violation of the settled, public policy of the forum enacted for the protection of its citizens, and (2) it was not adopted with the object of evading the otherwise applicatory law. See Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 536, 537, 27 A.L.R.2d 416; Duskin v. Pensylvania-Central Airlines Corporation, 6 Cir., 1948, 167 F.2d 727, 729, 730, certiorari denied 1948, 335 U. S. 829, 69 S.Ct. 56, 93 L.Ed. 382; William Whitman Co. v. Universal Oil Products Co., D.C.D.Del.1954, 125 F.Supp. 137, 147; Ragsdale v. Brotherhood of R. Trainmen, Mo.App.1942, 157 S.W.2d 785; Boole v. Union Marine Ins. Co., 1921, 52 Cal.App. 207, 198 P. 416. See, also, Annotation at 112 A.L.R. 124 and note at 62 Harv.L.Rev. 647 (1949). Furthermore, it is noted that Pennsylvania courts would apparently follow the rule laid down by the New York decisions cited in this section of the opinion. See Darrow v. Keystone, etc., Stores, Inc., 1950, 365 Pa. 123, 74 A.2d 176; Perry v. Payne, 1907, 217 Pa. 252, 66 A. 553, 11 L.R.A.,N.S., 1173.

68. In this case, the court used this language at page 37 of 2 N.E.2d:

"It is a general rule long established that contracts will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivocal terms. Employers' Liability Assur. Corp., Ltd., of London, England v. New York Linen Supply & Laundry Co., 239 N.Y. 560, 147 N.E. 195; Manhattan Ry. Co. v. Cornell, 54 Hun 292, 7 N.Y.S. 557, affirmed, 130 N.Y. 637, 29 N.E. 151.

"That such is the rule in this state has been recognized alike by the federal courts as well as courts of other states, the decision in Manhattan Ry. Co. v. Cornell, supra, being cited in support thereof. Cf. Wallace v. United States, D.C., 16 F.2d 309; affirmed 9 Cir., 18 F.2d 20; Perry v. Payne, 217 Pa. 252, 66 A. 553, 11 L.R.A.,N.S., 1173 * * *."

69. In this case, the court said at page 303: "While the parties are free to contract as between themselves for the ultimate burden of liability due to negligence, yet in the absence of explicit language to the contrary, courts will not interpret an indemnity agreement as a promise by the indemnitor to save harmless the indemnitee on account of the active negligence of the latter. * * Clearly the wording of the indemnity agreement in the case at bar is not sufficiently broad to require indemnification if the injury to the plaintiff can be charged to active negligence on the part of the Bank. In consequence the Bank cannot recover unless it is guilty of no more than passive negligence."

70. This language was used, 49 N.E.2d at page 510:

"The language of the indemnity agreement is not exactly the same as the language of the agreement the court construed in the earlier case, but the difference is not significant and, in applying the same rule of construction to the indemnity agreement, the conclusion seems again to follow that the owner or general contractor is not, under its

Erie County, 1949, 298 N.Y. 409, 84 N.E. 2d 38, 50–51, 10 A.L.R.2d 1.

■ Jarvis indemnifies Levitt for any damages sustained by it from "act or omission of the Contractor, his agents, servants and employees." There is no language by which Jarvis indemnifies Levitt for any act or omission of Levitt. This clause indicates an intention that Jarvis assume complete responsibility for its own negligence, but there is no unequivocal indication that it intended to be liable for Levitt's active negligence. There is nothing in this contract providing that Jarvis assumed any duty to notify the Philadelphia Electric Company that workmen were going on its land or under its wires.[71]

Furthermore, the above-mentioned rule uniformly followed by the New York Court of Appeals[72] should clearly be applied in this case in favor of Jarvis, in view of the rule of construction of contracts followed by the New York courts requiring any doubt as to the meaning of a contract to be resolved against the party preparing the contract.[73] The mimeographed form contract used in this case (D–40) was clearly prepared by Levitt and any doubt as to the meaning of paragraph 4 should be resolved against that company.

■ Also, Levitt claims that, even in absence of agreement, Jarvis is liable over to it upon the theory of indemnity at law in spite of the jury's finding of active negligence on the part of Levitt. An implied contract of indemnity arises only in favor of the wrongdoer who has been guilty of passive negligence and against the one who has been actively negligent. Builders Supply Co. v. McCabe, 1951, 366 Pa. 322, 77 A.2d 368, 24 A.L.R.2d 319; Muldowney v. Middleman, 1954, 176 Pa.Super. 75, 107 A.2d 173; McFall v. Compagnie Maritime Belge (Lloyd Royal) S.A., 1952, 304 N.Y. 314, 107 N.E.2d 463. Cf. Potter Title & Trust Co. v. Young, 1951, 367 Pa. 239, 80 A.2d 76. In Banks v. Central Hudson Gas & Electric Corp., 2 Cir., 1955, 224 F.2d 631, 634, certiorari denied 1955, 350 U.S. 904, 76 S.Ct. 182, the court said:

terms, entitled to indemnity from the other 'joint active tort feasor.' "

71. The cases relied on by Levitt's brief are inapplicable. The indemnity clause before the court in Ruddy v. New York Central Railroad Co., D.C.S.D.N.Y.1954, 124 F.Supp. 470, 472, reversed 2 Cir., 1955, 224 F.2d 96, specifically covered " ' * * * injury to persons * * * resulting from the presence * * * of structures * * * encroaching upon the aforesaid standard clearances * * * ' " whereas the form type wording of this indemnity clause discloses no intention of shifting the burden of Levitt's active negligence in this or any other factual situation to William A. Jarvis, Inc. It is also noted that Judge Hand emphasized, at page 99 of 224 F. 2d, that the indemnitor only insured injuries resulting from failure to maintain " 'standard clearance' * * * *but nothing more.*" (Emphasis supplied.) Similarly, in Rice v. Pennsylvania R. Co., 2 Cir., 1953, 202 F.2d 861, 862, liability resulting from negligence of the indemnitee for injuries during removal of scrap

bought by the indemnitor was imposed under an indemnity clause which specifically covered " ' 'damages for injuries to person or property, occurring during the removal of the said material.' " The decision in Mostyn v. Delaware, L. & W. R. Co., 2 Cir., 1947, 160 F.2d 15, certiorari denied 1947, 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355, would appear to support the ruling of the trial judge in this case.

72. In the case of Mostyn v. Delaware L. & W. R. Co., supra, the court said, 160 F.2d at pages 18–19:
" * * * for over ten years and in a series of decisions that court (New York Court of Appeals) has now laid down what appears to us to be an unswerving canon that if the indemnitee means to throw the loss upon the indemnitor for a fault in which he himself individually shares, he must express that purpose beyond any peradventure of a doubt."

73. Rentways, Inc., v. O'Neill Milk & Cream Co., 1955, 308 N.Y. 342, 126 N.E. 2d 271, 273, and cases there cited.

"It is the function of the jury to determine whether both defendants were guilty of negligence contributory to the harm: if so, to determine whether they were equally at fault in which event no right of indemnity arises."

By its finding that both Levitt and Jarvis were guilty of active negligence, the jury has established that they were "equally at fault" and, hence, no right of indemnity at law exists in favor of Levitt.[74]

### Order

And now, this 5th day of October 1956, it is ordered that the motion of Crane Operating Company, Inc., for a new trial is granted and that the judgment entered against Crane Operating Company, Inc., in the amount of $350,000 is set aside; it is further ordered that all motions of Levitt and Sons, Inc. filed 5/26/56 for a new trial and for the entry of judgment in its favor against plaintiff, William A. Jarvis, Inc., and Crane Operating Company, Inc. are denied.

### Appendix

Amounts Which Jury May Have Found For Certain Items Of Damages Suffered By Plaintiff With Authorities Indicating Such Amounts Are Not Excessive.

1. Loss of earnings (see footnote 24) ... $112,000.00
2. Allowance for future nursing, medical and related expenses (see footnote 25) ... 50,000.00
3. Out-of-pocket expenses, including loss of earnings to date of trial ... 31,500.00
4. Adequate compensation for permanent loss or impairment of limbs, organs, nerves and other parts of the body, including allowance for pain, suffering, humiliation and inconvenience:
 a. Limitation of motion of left arm due to pectorales major muscle and limitation on ability to use crutch under left arm. Feathersmith v. United States, D.C.E.D.Pa.1952, 104 F.Supp. 226, 229, 230; Homan v. Losch, 1951, 366 Pa. 525, 79 A.2d 242; Hudson v. Grace, 1943, 348 Pa. 175, 182–183, 34 A.2d 498, 150 A.L.R 366.
 b. Brain damage resulting in unresponsive states or comas of up to 15 or 20 minutes duration; buzzing in head at all times, difficulty in balancing, and 3 or 4 dizzy spells a week. (N.T. 217, 477, 586, 599.) Wright v. Pennsylvania Railroad Co., D.C.W.D.Pa.1954, 126 F.Supp. 152; Broad v. Pennsylvania Railroad Co., 1947, 357 Pa. 478, 483, 484, 55 A.2d 359; Sweet v. Rounds, 26 Erie 32, affirmed 1944, 349 Pa. 152, 36 A.2d 815.
 c. Blurring of vision so that plaintiff cannot read or see television (N.T. 142, 218–9, 478). Flusk v. Erie R. Co., D.C.D.N.J.1953, 110 F.Supp. 118, 125, 126; cf. Broad v. Pennsylvania Railroad Co., supra; Churbuck v. Union Railroad Co.,

74. For the same reason, Levitt could acquire no right of indemnity at law against Crane, even though Crane should be found responsible for active and primary negligence at its new trial. Under these circumstances, paragraph 3 of Levitt's Motions filed May 26, 1956, must be denied.

1955, 380 Pa. 181, 188, 110 A.2d 210; Mazi v. McAnlis, 1950, 365 Pa. 114, 121, 74 A.2d 108.

d. Loss of part of right foot under circumstances where satisfactory prosthesis is not available, so that plaintiff still cannot walk satisfactorily, even with crutches (N.T. 478). Magerko v. West Penn Rwys. Co., 1950, 365 Pa. 609, 613, 76 A.2d 618; cf. Riester v. Philadelphia Transp. Co., 1949, 361 Pa. 175, 62 A.2d 845.

e. Impairment of hearing, including ringing in ears at all times (N.T. 193, 593). Bier v. Pennsylvania R. Co., D.C.W.D.Pa.1950, 92 F.Supp. 864, 865; Wujnovich v. Equipment Corporation of America, D.C.W.D.Pa.1944, 54 F.Supp. 465, 469; cf. Bockstoce v. Pittsburgh Rwys. Co., 1946, 159 Pa.Super. 237, 242, 243, 48 A.2d 126.

f. Permanent damage to walls of the heart, involving scar tissue on heart muscle (N.T. 205). Magee v. General Motors Corp., D.C.W.D.Pa.1953, 117 F.Supp. 101, 104; cf. Young v. New York Auto Carrier Co., 1950, 364 Pa. 351, 358, 72 A. 2d 68.

g. Amputation of left leg above knee, together with vesiculation, or muscle spasms, of remaining part of leg. Conry v. Baltimore & O. R. Co., D.C.W. D.Pa.1953, 112 F.Supp. 252, 257; Riester v. Philadelphia Transp. Co., 1949, 361 Pa. 175, 62 A.2d 845.

h. Removal of large part of left chest wall requiring metal mesh wire support for chest cavity and lungs (N.T. 196, 197). Tyler v. Pittsburgh Railways Co., 1941, 343 Pa. 179, 22 A.2d 738.

i. Burning causing scar tissue. Bandy v. United States, D.C.D.Nev.1950, 92 F.Supp. 360; Teas v. Curtiss Wright Corp., 1949, 2 N.J.Super. 548, 65 A.2d 130; cf. Cunningham v. Pennsylvania R. Co., Pa.1945, 59 York 197 (1945 Pa.).

j. Nervous and mental condition, including neuroma at end of right leg, involuntary jerks of right leg, irritability, poor appetite, easy loss of temper, tenseness, and apprehension. Potochnik v. Pittsburgh Railways Co., 1954, 379 Pa. 154, 108 A.2d 733, 738; Landgraf v. United States, 75 F.Supp. 58, 61 (E.D.Pa.1947).

Total to subsection 4 160,000.00*

Total damages which the jury could have found for the plaintiff without making the verdict excessive $354,500.00

---

\* Consideration has been given to the marked inflation during the past ten years which requires upward revision of the amounts awarded in many of the above cited cases when applying them to this accident. See, also, footnote 33. It is also noted that an eye specialist, an orthopedist, and a neurologist examined plaintiff on behalf of the defendants and they were not called to contradict the testimony of plaintiff's doctors (N.T. 1152–1153).